## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.

SCOTT AIGEN, individually and on
behalf of others similarly situated,

      Plaintiff,

vs.                                                    **CLASS ACTION**

MARRIOTT INTERNATIONAL, INC.,
and STARWOOD HOTELS &
RESORTS WORLDWIDE, LLC,

      Defendants.

_____/

### CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, SCOTT AIGEN, individually and on behalf of others similarly situated, sue Marriott International, Inc. and Starwood Hotels & Resorts Worldwide, LLC (together, "Marriott"), and state:

### INTRODUCTION

1.    Plaintiff bring this action on behalf of a proposed class of approximately 500 million travelers from around the world who stayed at Marriott properties located in the United States between January 1, 2014, and September 10, 2018. For nearly four years, Marriott failed to secure and safeguard its customers' credit and debit card numbers and other payment card data ("PCD"), and other personally identifiable information ("PII"), which Marriott collected at the time Plaintiff and Class members made hotel reservations at its properties.

2.    On November 30, 2018, Marriott made a public announcement that it had "determined that there was unauthorized access to" its guest reservation and database system on or before September 10, 2018, and that there may have been unauthorized access as early as

2014 (the "Data Breach").[1] This unauthorized access was designed to retrieve PCD and PII from Marriott guests.

3.     On information and belief, Plaintiff's and Class members' Private Information was stolen by hackers when Plaintiff and Class members used their credit and debit cards at the affected Marriott branded hotels during this period.

4.     Marriott's security failures enabled the hackers to steal Plaintiff's and Class members' PCD and PII from within Marriott's guest reservation and database system, and to subsequently make unauthorized purchases on Plaintiff's credit and debit cards. The failures also put Plaintiff's financial information and interests at serious, immediate, and ongoing risk and, additionally, caused costs and expenses to Plaintiff attributable to responding, identifying, and correcting damages that were reasonably foreseeable as a result of Marriott's willful and negligent conduct. The hackers continue to use the information they obtained as a result of Marriott's inadequate security to exploit and injure Plaintiff and Class members around the world.

5.     The Data Breach was caused and enabled by Marriott's knowing violation of its obligations to abide by best practices and industry standards concerning the security of payment systems. Marriott failed to comply with security standards and allowed its customers' financial information to be compromised by cutting corners on security measures that could have prevented or mitigated the Data Breach that occurred.

6.     The Data Breach was the inevitable result of Marriott's inadequate approach to data security. The deficiencies in Marriott's data security were so significant that the malware

---

[1] SEC.gov, *Marriott Announces Starwood Guest Reservation Database Security Incident*, November 30, 2018, available at: https://www.sec.gov/Archives/edgar/data/1048286/000162828018014745/a2018ex99.htm (last visited Nov. 30, 2018) (hereinafter, "SEC.gov, *Marriott Security Incident"*).

installed by the hackers remained undetected and intact for years. Marriott disregarded the rights of Plaintiff and Class members by intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected, failing to take available steps to prevent and stop the breach from ever happening, and failing to disclose to its customers the material fact that it did not have adequate security practices that could protect customers' data.

7.      Accordingly, Plaintiff, on behalf of himself and other members of the Class, assert claims for breach of implied contract, negligence, and violations of Florida's Deceptive and Unfair Trade Practices Act, § 501.201 *et seq.*, Fla. Stat., and seek monetary damages, statutory damages, and all other relief as authorized in equity or by law.

## PARTIES

### *Plaintiff*

8.      SCOTT AIGEN resides in Miami Beach, Florida, and is a citizen of the State of Florida. SCOTT AIGEN stayed at an affected Marriott, the W Lakeshore, in Chicago, Illinois on September 25, 2016. SCOTT AIGEN used his credit card to pay for the stay and had his PCD and PII exposed as a result of Marriott's inadequate security.

9.      Following the Data Breach, SCOTT AIGEN experienced fraud on his credit account, resulting in out-of-pocket losses. SCOTT AIGEN also spent time inspecting his credit card statements for fraudulent activity. SCOTT AIGEN had to wait seven days for delivery of a new credit card to replace his compromised one. SCOTT AIGEN has also suffered from the deprivation of the value of his PII and the lost benefit of his bargain with Marriott.

### *Defendants*

10.      Marriott International, Inc. is headquartered in Bethesda, Maryland, and is traded on the NASDAQ under the symbol "MAR." It is a multinational, diversified hospitality company

that manages and franchises a broad portfolio of hotels and related lodging facilities, and is one of the largest hotel chains in the world with more than 6,700 properties in 129 countries and territories worldwide, accommodating over 1.1 million rooms. Marriott International, Inc. operates 30 hotel brands, including Marriot, Starwood, and The Ritz-Carlton.

11.     Starwood Hotels and Resorts Worldwide, LLC is headquartered in Stamford, Connecticut, and is a fully owned subsidiary of Marriott International, Inc. Starwood branded properties include W Hotels, St. Regis, Sheraton Hotels & Resorts, Westin Hotels & Resorts, Element Hotels, Aloft Hotels, The Luxury Collection, Tribute Portfolio, Le Méridien Hotels & Resorts, Four Points by Sheraton, and Design Hotels, as well as Starwood branded timeshares. On September 23, 2016, Marriott completed the acquisition of Starwood Hotels & Resorts Worldwide, LLC, formerly known as Starwood Hotels & Resorts Worldwide, Inc.

## JURISDICTION AND VENUE

12.     The Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332 ("CAFA"), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendants' citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

13.     The Court has personal jurisdiction over Marriott International, Inc. because it has significant continuous and pervasive contacts with the State of Florida.

14.     The Court has personal jurisdiction over Starwood Hotels and Resorts Worldwide, LLC because it has significant continuous and pervasive contacts with the State of Florida.

15.     Venue is proper in this District under 28 U.S.C. §§ 1391 (b)(1), 1391(b)(2), and 1391(d), because a substantial part of the events and omissions giving rise to the claims

emanated from activities within this District, and Marriott International, Inc. and Starwood Hotels and Resorts Worldwide, LLC conduct substantial business in this District.

## FACTUAL ALLEGATIONS

**A.  Marriott and Its Customer Data Collection Practices.**

16.     Founded in 1927, Marriott is the largest hotel chain in the world. It owns more than 6,700 properties in 129 countries and territories worldwide, which together generated over $22.8 billion in revenue in 2017.

17.     Marriott collects, receives, accesses, and maintains possession of its customers' PII, including customers' names, dates of birth, Social Security numbers, passport information, physical addresses, email addresses, telephone numbers, demographic information, and other data collected in the normal course of providing and obtaining payment for hospitality services. Between January 1, 2014 and September 10, 2018, Marriott stored customer PCD and PII in electronic form, including in the Starwood guest reservation database.

**B.  PII is Highly Valuable on the Black Market.**

18.     The type of information compromised during the Data Breach is immensely valuable to identity thieves. Plaintiff's and Class members' names, email addresses, recovery email accounts, telephone numbers, credit card payment information, passport information, and other PII can all be used to access to a variety of Plaintiff's electronic accounts.

19.     The Federal Trade Commission ("FTC") cautions that identity theft wreaks havoc on consumers' finances, credit history, and reputation and can take time, money, and patience to

resolve.[2] Identity thieves use stolen PII for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[3]

20.    Identity thieves can also use the PII to harm Plaintiff through embarrassment, blackmail, or harassment in person or online, or to commit other types of fraud, including obtaining ID cards or driver's licenses, fraudulently obtaining tax returns and refunds, and obtaining government benefits.

21.    At an FTC public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's PII:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy. Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[4]

---

[2] *See Taking Charge, What to Do If Your Identity is Stolen*, FTC, at 3 (2012), available at: http://www.consumer.ftc.gov/articles/pdf-0009-taking-charge.pdf (last visited November 30, 2018).

[3] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official  State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id*.

[4] Federal Trade Commission Public Workshop, *The Information Marketplace: Merging and Exchanging        Consumer        Data*,        available        at: ttps://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited November 30, 2018).

22.     Commissioner Swindle's 2001 remarks are even more relevant today, as consumers' personal data functions as a "new form of currency" that supports a $26 billion per year online advertising industry in the United States.[5]

23.     The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[6]

24.     Recognizing the high value that consumers place on their PII, many companies now offer consumers an opportunity to sell this information. The idea is to give consumers more power and control over the type of information that they share and who ultimately receives that information. And, by making the transaction transparent, consumers will make a profit from their PII.[7] This business has created a new market for the sale and purchase of this very valuable data.[8]

25.     Consumers place a high value not only on their PII, but also on the privacy of that data. Researchers have begun to shed light on how much consumers value their data privacy, and

---

[5] *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy*, The Wall Street Journal, available at: http://online.wsj.com/article/SB10001424052748703529004576160764 037920274.html (last visited November 30, 2018).

[6] *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable*, (Dec. 7, 2009), available at: http://www.ftc.gov/speeches/harbour/091207 privacyroundtable.pdf (last visited November 30, 2018).

[7] Steve Lohr, *You Want My Personal Data? Reward Me for It*, The New York Times, available at: http://www.nytimes.com/2010/07/18/business/18unboxed.html (last visited November 30, 2018).

[8] *See Web's Hot New Commodity: Privacy*, available at: http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited November 30, 2018).

the amount is considerable. Indeed, studies confirm that the average direct financial loss for victims of identity theft in 2014 was $1,349."[9]

26.     The value of Plaintiff's and Class members' PCD and PII on the black market is substantial. Credit card numbers range in cost from $1.50 to $90 per card number.[10]

27.     Accordingly, any company that transacts business with consumers and then compromises the privacy of those consumers' PCD and PII has deprived that consumer of the full monetary value of the consumer's transaction with the company.

**C.  Plaintiff Relied on Marriott to Adequately Protect Their Sensitive Information.**

28.     Marriott has a legal duty to act reasonably to protect customers' PII and PCD from exposure to unauthorized third parties.

29.     When Plaintiff provided Marriott with their PII and PCD, Plaintiff expected that his information would be stored by Marriott in a safe and confidential manner, using all reasonable safeguards and protections.

30.     Marriott is well aware of the costs and risks associated with PCD and PII, as acknowledged in its regulatory filings:

> In the operation of our business, we collect, store, use, and transmit large volumes of data regarding associates, guests, customers, owners, licensees, franchisees, and our own business operations, including credit card numbers, reservation and loyalty data, and other personal information, in various information systems that we maintain and in systems maintained by third parties, including our owners, franchisees, licensees, and service providers. The integrity and protection of this data is critical to our business.

---

[9] See Department of Justice, *Victims of Identity Theft, 2014*, at 6 (2015), available at: https://www.bjs.gov/content/pub/pdf/vit14.pdf (last visited November 30, 2018).

[10] *The Cyber Black Market: What's Your Bank Login Worth*, available at https://leapfrogservices.com/the-cyber-black-market-whats-your-bank-login-worth/ (last visited November 30, 2018).

      *        *        *

> Our guests and associates also have a high expectation that we, as well as our owners, franchisees, licensees, and service providers, will adequately protect and appropriately use their personal information. [11]

**D. Marriott Knew that a Breach of Its Data System Was a Foreseeable Risk.**

31.     With data breaches and identity theft on the rise, Marriott knew that a breach of its computer systems was a foreseeable risk. Following several high-profile data breaches in recent years, including those involving Target, Experian, Yahoo, Home Depot, and Sony, Marriott was on notice of the risk that hackers could seek to exploit vulnerabilities in its data security.

32.     Marriott knew, given the vast amount of PCD and PII in its computer systems, that it was a likely target for cyber security attacks, and appreciated the risks posed by its insecure and vulnerable network of computer systems. Twenty-four days before announcing the Data Breach, Marriott admitted "[w]e have implemented security measures to safeguard our systems and data … but our measures … may not be sufficient to maintain the confidentiality, security, or availability of the data we collect, store, and use to operate our business."[12]

**E. Marriott Failed to Protect Customers' PCD and PII.**

33.     On November 30, 2018, Marriott announced a data security incident involving the Starwood guest reservation database.

34.     According to a November 30, 2018 announcement by Marriott:

> Marriott received an alert from an internal security tool regarding an attempt to access the Starwood guest reservation database in the United States. Marriott quickly engaged leading security experts to help determine what occurred. ***Marriott learned during the investigation that***

---

[11] Marriott Form 10-Q for the quarter ended September 30, 2018, pp. 49-50, filed with the SEC on November 6, 2018, twenty-four days before announcing the Data Breach.

[12] *Id.*

> *there had been unauthorized access to the Starwood network since 2014.*[13]

35.    Marriott's announcement further identified the scope of the Data Breach, and the assortment of PCD and PII compromised over the preceding four-year period:

> The company has not finished identifying duplicate information in the database, but believes it contains information on up to approximately *500 million guests* who made a reservation at a Starwood property. For approximately 327 million of these guests, the information includes some combination of *name, mailing address, phone number, email address, passport number, Starwood Preferred Guest ("SPG") account information, date of birth, gender, arrival and departure information, reservation date, and communication preferences. For some, the information also includes payment card numbers and payment card expiration dates*, but the payment card numbers were encrypted using Advanced Encryption Standard encryption (AES-128). There are two components needed to decrypt the payment card numbers, and at this point, Marriott has not been able to rule out the possibility that both were taken. For the remaining guests, the information was limited to name and sometimes other data such as mailing address, email address, or other information.[14]

36.    Marriott purportedly discovered the Data Breach on September 8, 2018, yet took months to publicly disclose its existence to the public.[15]

## F. Marriott Failed to Comply with Federal Security Requirements and Industry Standards.

37.    According to the FTC, the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act of 1914 ("FTC Act"), 15 U.S.C. § 45.

---

[13] SEC.gov, *Marriott Security Incident*, *supra* n.1 (emphasis added).

[14] *Id.* (emphasis added).

[15] *Id.*

38.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which establishes guidelines for fundamental data security principles and practices for business.[16] The guidelines note businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

39.     The FTC recommends that companies not maintain cardholder information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[17]

40.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

---

[16] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Dec. 12, 2018).

[17] Federal Trade Commission, *Start with Security*, available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Dec. 12, 2018).

41.     Marriott's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by the FTC Act.

42.     In addition, Marriott failed to comply with Payment Card Industry Data Security Standards ("PCI DSS"). PCI DSS is a set of requirements designed to ensure that companies maintain consumer credit and debit card information in a secure environment.[18]

43.     The PCI DSS "was developed to encourage and enhance cardholder data security" by providing "a baseline of technical and operational requirements designed to protect account data."[19] PCI DSS sets the minimum level of what business should do to protect customers' PCD.

44.     PCI DSS 3.2, the version of the standards in effect at the time of the Data Breach, impose the following mandate on Marriott:

| PCI Data Security Standard – High Level Overview | | |
|---|---|---|
| Build and Maintain a Secure Network and Systems | 1. | Install and maintain a firewall configuration to protect cardholder data |
| | 2. | Do not use vendor-supplied defaults for system passwords and other security parameters |
| Protect Cardholder Data | 3. | Protect stored cardholder data |
| | 4. | Encrypt transmission of cardholder data across open, public networks |
| Maintain a Vulnerability Management Program | 5. | Protect all systems against malware and regularly update anti-virus software or programs |
| | 6. | Develop and maintain secure systems and applications |
| Implement Strong Access Control Measures | 7. | Restrict access to cardholder data by business need to know |
| | 8. | Identify and authenticate access to system components |
| | 9. | Restrict physical access to cardholder data |
| Regularly Monitor and Test Networks | 10. | Track and monitor all access to network resources and cardholder data |
| | 11. | Regularly test security systems and processes |
| Maintain an Information Security Policy | 12. | Maintain a policy that addresses information security for all personnel |

---

[18] Payment Card Industry Security Standards Council, *Requirements and Security Assessment Procedures Version 3.2*, April 2016, available at: https://pcicompliance.stanford.edu/sites/g/files/sbiybj7706/f/pci_dss_v3-2.pdf (last visited Dec. 12, 2018).

[19] *Id.*

45.     Among other things, PCI DSS requires Marriott to: properly secure and protect PCD; not store cardholder data beyond the time necessary to authorize a transaction; maintain up-to-date antivirus software and a proper firewall; protect systems against malware; regularly test security systems; establish a process to identify and timely fix security vulnerabilities; and encrypt payment card data at the point of sale.

46.     In this case, Marriott was at all times fully aware of its obligation to protect the personal and financial data of Marriott's guests and customers because of its participation in the storage of PII, storage of PCD, and interactions with payment card processing networks. Marriott was also aware of the significant repercussions if it failed to do so because Marriott collected payment card data from hundreds of thousands of guests and customers daily and they knew that this data, if hacked, would result in injury to consumers, including Plaintiff and Class members.

**G.  The Marriott Data Breach Caused Harm and Will Result in Additional Fraud.**

47.     The Data Breach has inflicted immediate, hard costs on Plaintiff and members of the Class.

48.     Marriott failed to follow industry standards and failed to effectively monitor their security systems to ensure the safety of customer information. Marriott's substandard security protocols and failure to adequately monitor for unauthorized intrusion caused Plaintiff and the Class's PCD and PII to be compromised for years without detection by Defendants.

49.     Plaintiff and the Class have incurred, and will continue to incur, substantial damage because of Marriott's failures to meet reasonable standards of data security.

50.     As a result of the Marriott's data breach, Plaintiff and the Class are required to cancel payment cards, change or close accounts, investigate fraudulent activity, and take other steps to protect themselves in an effort to reduce the risk of future, but certainly impending, identity theft, loan fraud, and other fraudulent transactions.

51.     Sensitive personal and financial information, like the information compromised in this breach, is extremely valuable. Criminals have gained access to complete profiles of individuals' personal and financial information. They can now use this data to steal the identities of the consumers whose information has been compromised or sell it to others who plan to do so. In this manner, unauthorized third parties can assume the stolen identities (or create entirely new identities from scratch) to make transactions or purchases, open credit or bank accounts, apply for loans, forge checks, commit immigration fraud, obtain a driver's license in the member's or customer's name, obtain government benefits, or file a fraudulent tax return. A report by the Department of Justice found that 86% of identity theft victims in 2014 experienced the fraudulent use of existing account information, including credit card and bank account information.[20]

52.     Consumers inevitably face significant emotional distress after theft of their identity. The fear of financial harm can cause significant stress and anxiety for consumers. According to the Department of Justice, an estimated 36% of identity theft victims experienced moderate or severe emotional distress as a result of the crime.[21]

53.     Marriott's wrongful actions and inaction directly and proximately caused the theft and dissemination into the public domain of Plaintiff's and Class members' PCD and PII, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

    a.  theft of their personal and financial information;

    b.  unauthorized charges on their debit and credit card accounts;

---

[20] Erika Harrell, *Victims of Identity Theft, 2014*, U.S. Department of Justice, Bureau of Justice Statistics, NCJ 248991, Sept. 2015, available at 1, https://www.bjs.gov/content/pub/pdf/vit14.pdf (last visited Dec. 12, 2018).
[21] *Id.*

c.   the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their credit/debit card and personal information being placed in the hands of criminals and misused via the sale of Plaintiff's and Class members' information on the Internet's black market;

d.   the untimely and inadequate notification of the Data Breach;

e.   the improper disclosure of their PII;

f.   loss of privacy;

g.   ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach;

h.   ascertainable losses in the form of deprivation of the value of their PII, for which there is a well-established national and international market;

i.   ascertainable losses in the form of the loss of cash back or other benefits as a result of their inability to use certain accounts and cards affected by the Data Breach;

j.   loss of use of, and access to, their account funds and costs associated with the inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit including adverse credit notations; and,

k.   the loss of productivity and value of their time spent to address, attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, and the inconvenience, nuisance and annoyance of dealing with all such issues resulting from the Data Breach.

54.   Ultimately, Plaintiff and Class members are faced with considerable present injury, and an immediate future of continually unfolding new and continued injuries as a result of Marriott's avoidable data breach.

## **CLASS ACTION ALLEGATIONS**

55.     Pursuant to Rule 23(b)(2), (b)(3) and (c)(4) of the Federal Rules of Civil Procedure, Plaintiff, individually and on behalf of all others similarly situated, brings this lawsuit on behalf of themselves and as a class action on behalf of the following "Global Class" defined as follows:

> All persons who provided PII (including PCD) to Marriott and whose PII was accessed, compromised, or stolen from Marriott during the Data Breach.

56.     The Class excludes:  (1) Marriott, any entity in which Marriott has a controlling interest, any entity which has a controlling interest in Marriott, and their respective legal representatives, officers, directors, members, managers, employees, assigns, subsidiaries, and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; (3) any juror assigned to this action; and (4) Class Counsel.

57.     Plaintiff reserve the right to modify or amend the definitions of the proposed classes before the Court determines whether certification is appropriate.

58.     **Numerosity**.  Members of each of the Class are so numerous that individual joinder of all members is impracticable.  Plaintiff reasonably believes that the number of Class members exceeds 1,000,000.

59.     **Commonality**. There are common questions of law and fact that predominate over questions affecting only individual Class members. These common legal and factual questions include, but are not limited to:

    a.   whether Marriott owed a duty to Plaintiff and members of the Class to protect PCD and PII;

    b.   whether Marriott failed to provide reasonable security to protect PCD and PII;

    c.   whether Marriott negligently or otherwise improperly allowed PCD and PII to be accessed by third parties;

d.   whether Marriott failed to adequately notify Plaintiff and members of the Class that their data systems were breached;

e.   whether Plaintiff and members of the Class were injured and suffered damages and ascertainable losses;

f.   whether Marriott's actions, which failed to reasonably secure Plaintiff's and the Class's PCD and PII, proximately caused the injuries suffered by Plaintiff and members of the Class;

g.   whether Plaintiff and members of the Class are entitled to damages and, if so, the measure of such damages; and

h.   whether Plaintiff and members of the Class are entitled to declaratory and injunctive relief.

60.   **Typicality**. Plaintiff's claims are typical of the claims of the other members of their respective classes because, among other things, Plaintiff and the other Class members were injured through the substantially uniform misconduct by Marriott. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of other Class members arise from the same operative facts and are based on the same legal theories.

61.   **Adequacy of Representation:** Plaintiff is an adequate representative of the class he seeks to represent and will fully and adequately assert and protect the interests of the absent Class members. Plaintiff is committed to the vigorous prosecution of this action and has retained Class counsel who have considerable experience in litigation of this nature. Plaintiff anticipates no difficulty in the management of this litigation as a class action.

62.   To prosecute this case, Plaintiff has chosen the undersigned law firm, which is experienced in class action litigation and has the financial and legal resources to meet substantial costs and legal issues associated with this type of litigation.

63.   Neither Plaintiff nor his attorneys have any interests contrary to or conflicting with the interests of absent class members.

64.     **Requirements of Fed. R. Civ. P. 23(b)(3)**. The questions of law or fact common to Plaintiff's and each Class member's claims predominate over any questions of law or fact affecting only individual members of the class.

65.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

66.     A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the absent Class members' claims is economically infeasible and procedurally impracticable. Class members share the same factual and legal issues and litigating the claims together will prevent varying, inconsistent, or contradictory judgments, and will prevent delay and expense to all parties and the court system through litigating multiple trials on the same legal and factual issues. Class treatment will also permit Class members to litigate their claims where it would otherwise be too expensive or inefficient to do so.

67.     Contact information for each Class member, including mailing addresses, is readily available, facilitating notice of the pendency of this action.

68.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

## CLAIMS

### COUNT I
### Breach of Implied Contract
### (Against All Defendants)

Plaintiff incorporates paragraphs 1-68 as if fully set forth herein.

69.     Marriott's customers who intended to make payments at Marriott hotels with debit or credit cards were required to provide their PCD.

70.     In providing such financial data, Plaintiff and the other members of the Class entered into an implied contract with Marriott, whereby Marriott became obligated to reasonably safeguard Plaintiff's and the other Class members' PCD and PII.

71.     Under the implied contract, Marriott was obligated not only to safeguard the PCD and PII, but also to provide Plaintiff and the other Class members with prompt, adequate notice of any security breach or unauthorized access of said information.

72.     Marriott breached the implied contract with Plaintiff and the other members of the Class by failing to take reasonable measures to safeguard their PCD and PII.

73.     Marriott also breached its implied contract with Plaintiff and the other Class members by failing to provide prompt, adequate notice of the Security Breach and unauthorized access of their Personal Information by hackers.

74.     Plaintiff and the other Class members suffered and will continue to suffer damages including, but not limited to: (i) improper disclosure of their Personal Information; (ii) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and identity fraud pressed upon them by the Security Breach; (iii) the value of their time spent mitigating the increased risk of identity theft and/or identity fraud; (iv) the increased risk of identity theft; and (v) deprivation of the value of their Personal Information, for which there is a well-established national and international market—for which they are entitled to compensation. At the very least, Plaintiff and the other Class members are entitled to nominal damages.

**COUNT II**
**Negligence**
**(Against All Defendants)**

Plaintiff incorporates paragraphs 1-68 as if fully set forth herein.

75.     Marriott owed Plaintiff and the Class a common-law duty to exercise reasonable care in the collection and storage of their PCD and PII.

76.     Marriott's duty included an obligation to take reasonable protective measures against the foreseeable risk to Plaintiff and the Class that harm would inevitably result if their PCD or PII were interfered with, stolen, or copied while in Marriott's possession.

77.     Marriott knew or should have known that by collecting and storing PCD and PII, it created a valuable trove of information that was a foreseeable target for third-party interference, copying, or theft.

78.     Marriott knew or should have known that companies possessing similar data troves have in fact been targeted for hacking in highly publicized data breaches, including Yahoo, Equifax, Wyndham, Home Depot, and Sony, to name just a few.

79.     Once Marriott chose to collect and store PCD and PII belonging to Plaintiff and the Class members, only Marriott was in a position to secure its valuable data trove from the foreseeable risk of third-party interference, copying, or theft.

80.     Marriott's duty to act reasonably in collecting and storing PCD and PII also arises under Section 5 of the FTC Act, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect PCD and PII.

81.     Plaintiff and the Class members reasonably assume that major corporations like Marriott would adhere to basic industry standards with respect to the collection and storage of PCD and PII, including, but not limited to, the PCI DSS standards.

82.     Marriott breached its common law and statutory duties by failing to use reasonable data collection, storage, and security practices. In addition to Marriott's initial negligence in storing PCD and PII on a system vulnerable to outside penetration, Marriott's negligence persisted for at least four years, during which time Marriott failed to detect the ongoing compromise, and failed to improve security practices in a way that could end the breach.

During those years, Marriott missed numerous opportunities to stop or mitigate the data breach at a point in time when fewer individuals might have been harmed.

83.     Marriott's negligent data collection and storage practices led to a foreseeable result: the valuable PCD and PII associated with Plaintiff and the Class was copied or stolen by unauthorized third parties, who are now well-equipped to perpetrate fraud and identity theft at the expense of Plaintiff and the Class members.

84.     As a direct and proximate result of Marriott's negligence, Plaintiff and the Class have been harmed in several ways. They are all now at an increased risk of being victims of identity theft, financial impersonation, and a variety of other fraudulent schemes, including those that use targeted phishing or social engineering techniques facilitated by the use of compromised PII elements against victims. To guard against the heightened risk of these crimes, Plaintiff and the Class will need to invest more of their time and money on monitoring their finances, tax records, credit scores, and accounts of all types, including financial institutions, social media, loyalty programs, online retailers, and others.

85.     Plaintiff and the Class have suffered, and continue to suffer, injury, including, but not limited to, investing time and money in cancelling payment cards, changing or closing accounts, and taking other steps to monitor their identities and protect themselves.

86.     But for Marriott's negligence, the PCD and PII of Plaintiff and the Class would not have been exposed, or in the alternative, Plaintiff and the Class would have at least learned of the compromise at an earlier point in time when some of their damages may have been mitigated.

## COUNT III
### Violation of Florida's Deceptive and Unfair Trade Practices Act, § 501.201 *et seq.*, Fla. Stat. (Against All Defendants)

Plaintiff incorporates paragraphs 1-68 as if fully set forth herein.

87. This Count is brought pursuant to Florida's Deceptive and Unfair Trade Practices Act, § 501.201 *et seq.*, Fla. Stat. ("FDUTPA").

88. Plaintiff is a "consumer" who used his credit card to make payments to Marriott. *See* § 501.203(7), Fla. Stat.

89. FDUTPA prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204, Fla. Stat.

90. Marriott, by failing to inform consumers (including Plaintiff and the Class members) of its unsecure, non-compliant, and otherwise insufficient data and information security practices, advertised, sold, serviced, and otherwise induced those consumers to purchase goods and services from Marriott.

91. Marriott knew or should have known that its computer systems and data security practices were inadequate to safeguard Plaintiff's and Class members' PCD and PII, and that the risk of a data breach was highly likely.

92. Marriott should have disclosed this information regarding its computer systems and data security practices because Marriott was in a superior position to know the true facts related to its defective data security.

93. Additionally, Florida law requires notification of data breaches upon identification. Marriott identified the Data Breach as early as September 2018, but only notified consumers on November 30, 2018, and therefore left those consumers at risk for the months in between discovery and notification.

94.    Marriott's failures constitute false and misleading representations, which have the capacity, tendency, and effect of deceiving or misleading consumers (including Plaintiff and Class members) regarding the security of its network and aggregation of PCD and PII.

95.    In addition, the facts upon which consumers (including Plaintiff and Class members) relied were material facts, the veracity of which was not true (*e.g.*, protection of PCD and PII), and consumers (including Plaintiff and Class Members) relied on those false facts to their detriment.

96.    Marriott employed these false representations to promote the sale of a consumer good or service, which Plaintiff and the Class members purchased.

97.    As a direct and proximate result of Marriott's unconscionable, unfair, and deceptive acts or practices, Plaintiff and Class Members have suffered and will continue to suffer injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and damages as prescribed by § 501.211(2), Fla. Stat., including attorneys' fees.

## PRAYER FOR RELIEF

Accordingly, Plaintiff, both individually and on behalf of the other Class members, respectfully request this Court enter an Order:

a. Certifying the Global Class, and appointing Plaintiff and Plaintiff's counsel to represent the Classes;

b. Enter a monetary judgment in favor of Plaintiff and the Classes to compensate them for the injuries they have suffered, together with pre-judgment and post-judgment interest and treble damages and penalties where appropriate;

c. Award Plaintiff and the Classes reasonable attorneys' fees and costs of suit, as allowed by law; and

d. Award such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable on behalf of themselves and all similarly situated persons.

Dated: December 17, 2018.          Respectfully submitted,

/s/ Roy K. Altman
**Roy K. Altman, Esq.**
Florida Bar No. 116885
Podhurst Orseck, P.A.
One SE 3rd Avenue, Suite 2300
Miami, Florida 33301
Tel: 305-358-2800
Fax: 305-358-2382
raltman@podhurst.com